Your Honor, this is the final case of the morning called 2-09581. We're here at Arellano v. Illinois Department of Human Services. On behalf of the F1, Mr. Dennis A. Bremner. On behalf of the L.A., Mr. Carl J. Edens. Good morning. Dennis Bremner on behalf of the Plaintiff Appellant, Olvera Arellano. I'm just going to address, if I could, the question the court directed to the parties to talk about the statutory history on this and whether or not the regulations were an impermissible alteration of the statute. And just to answer that question simply, I think that basically is our position. If we look at this particular case, it's pretty clear that Olvera Arellano met all the criteria under the federal statute to be eligible for federal alien emergency coverage. This was not, as the record shows down below, groups of the party, I think, are in the same mind. Basically, she did not have an organ transplant. She met the criteria for Medicaid eligibility in terms of being categorically eligible. She was a caretaker of five minor children. She met the financial qualifications in terms of limited assets and income. She also met the residential requirements. She was residing in Rockford, Illinois, for two and a half years prior to seeking emergency treatment for a medical condition. So she wasn't someone who was coming up from Mexico to seek medical care in the United States. If you look at the medical records, and of course what's determined down below as well, there was no chronic condition. She was a 38-year-old healthy individual with no past history, smoked, didn't drink, no reports of drug use. Again, if you look at those criteria, and even the state stipulates in its brief on page 12, she definitely had an emergency medical condition that required immediate treatment to prevent serious jeopardy to her health. And that would allow her to receive the Medicare benefits. And as you said, you started out your argument by saying, it is your position that the sudden onset requirement impermissibly modifies the Medicaid statute and therefore cannot be enforced. But on what specific factors or legislative history do you base that conclusion? I base that conclusion on the fact that there was the first regulation we see on that, which the court referred to, 42 CFR 447-53, and it was a payment statute. It was talking about what services are covered and are going to be compensated. It talked about emergency services under A-4. It indicates that emergency services providing a hospital, clinic, office, or other facility is equipped to furnish the required care. After the sudden onset of a medical condition manifesting itself, and it repeats the same language that we see mirrored in the alien emergency statute. So the only thing missing out of the subsequent federal legislation, the Congress' act, was that they dropped the sudden onset and just started out with a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain. The absence of medical attention could result in a reasonably expected result in placing the patient's health in serious jeopardy. The three conditions are there. So the first regulation that we see on this addressing this does have the sudden onset in there, but again, it's a regulation. Congress then passes a law that takes that language out entirely, and then they subsequently pass in TALA. Again, the language mirrors this in terms of the start but excludes the sudden onset. And then in 1990, after the two federal laws are passed, then at that point in time, the Department comes in with regulations. The regulations add the sudden onset language in there. And the language in which it responds to commentators and puts forth this regulatory change doesn't indicate that they're going to restrict coverage. They indicate they're putting this language in for purposes of expanding coverage. They believe a broad definition allows states to interpret further and define the services available to aliens covered by Section 1903 v. 2. So they're saying we're going to put this language in. This is going to allow an expansion of coverage. The reality is, obviously, as you look at this case, it's actually used to deny coverage, not to expand it. And it doesn't appear to have anything to do with any type of medical treatment. There's really no indication as to what the sudden onset condition is for. I mean, it doesn't really add anything to it. If you look at the record below, they discuss it, but it's all just based on sudden onset. There's no doubt that all the other criteria were met. So looking at that legislative history, it looks like Congress certainly had an opportunity to add the sudden onset language, which was in the prior regulation, into both the alien emergency statute and then the TALA statute. They exclude it, and then, unfortunately, the Department comes back and puts the language back in. So you're asking us to reverse and amend, just reverse? What are you asking us to do? Asking you to reverse, find that she's eligible for alien emergency under federal statute. Because, unfortunately, what's happened with the regulations is that the Illinois Administrative Code adopts that language. The Department's own manual adopts that language with the sudden onset. So you see a narrowing of the statutory intent from Congress. I mean, pretty clear. And, you know, we cited a bunch of cases from other jurisdictions, and if you look at those cases, almost all of them indicate that the statute is very clear. It's not ambiguous. It's unambiguous. Well, let's look at this from a procedural administrative standpoint. If we accede to your contention that the Department employed an incorrect standard when it held that the claimant failed to meet the sudden onset requirement, isn't there also an issue, though, of whether or not the plaintiff's condition qualified as an emergency medical condition? Is there an issue as to whether or not it did qualify for that? Is there an issue in this case? No. I mean, again, on page 12 of defendant's brief, they indicate that she did have an emergency medical condition that, absent immediate treatment, would result in a severe injury to her health. Were there specific findings that hold that she had an emergency medical condition? That was a finding of fact by the Department? The finding of fact by the Department was that she, the Department's policy was followed and there wasn't a sudden onset. That was the finding by the Department. So how does that, in and of itself, determine that she qualified as an emergency medical condition? How does that, in and of itself, determine that? Well, again, if you look at the record down below, the indication is that this was the only reason they denied it, that she, again, she met all the qualifications. If you look at the testimony at the administrative hearing, the Department was asked, was there any other reason for denying it? They were asked, well, did she meet categorical requirements? Did she meet financial requirements? Yes. And they indicate that it's an emergency medical condition, but they're just saying it doesn't meet the onset requirements. So they're applying the inappropriate standard to this, again, not the legal standard authorized by Congress. What I'm getting at is if they don't make a specific finding that would qualify her irrespective of the sudden onset, what then becomes the ultimate remedy? Wouldn't we arguably have to, if we agree with your position, remand it back to the Department to determine whether there was an emergency medical condition? So there's some finding of fact on that basis? If you look at the CAU decisions, which is what the Department based its determinations on, there were three decisions from the Client Assessment Unit in Springfield. Those three decisions indicate they cite that she had emergency treatment, they cite what her condition was, and they basically indicate, they don't say it's not an emergency medical condition, what they say is sudden onset is. So the only reason that they didn't find that way, if you look at their actual decisions, was that it was not a sudden onset. I guess what I'm saying, when we were parsing over the same issue, are you asking us to read between the lines, or there was a specific finding by the Department that this was an emergency medical condition? They're not necessarily the same thing. No, but I think, again, if you look at the position of the parties here, if you look at the briefs and the defendant's position on it, they're stipulating that she had an emergency medical condition that resulted in serious jeopardy. So they're saying that's not an issue. Even the defendants are saying she did have an emergency medical condition. She did have that. They're not saying she doesn't. So at this point, the only issue is the sudden onset, which is not an appropriate requirement. So you're saying either we infer that or the other side has conceded that there's an emergency medical condition. If, again, page 12 of their brief, they've conceded that. So there'd be no reason to remand for hearing on that issue, you're saying? I don't believe so, no. I think it's something the court has the authority to reverse or remand. I mean, I'm asking you to reverse. Obviously, it's up to the court whether you reverse it or remand, but it seems based on the positions of the party here and what took place below. On the record down below, the only issue was the only reason for denial was an onset. No sudden onset. That was the only reason for it. Okay. Thank you. You don't have time for rebuttal after we hear from the Attorney General. Thank you for your time. Thank you. Who's going to tell us to defer to the agency's interpretation? I'm always going to tell you that, Your Honor. Exactly. May it please the Court, I'm Assistant Attorney General Carl Elis, appearing for the Illinois Department of Health Care and Family Services and the Department of Human Services. Good afternoon, Counsel. Exactly, Your Honor. I'm going to urge the Court to defer. The question in this case is the question that is typical in administrative review cases. What is the rule of law to be applied, and has the agency properly applied the relevant rule of law? Now, when I briefed the argument in the beginning, it looked to me like the main contention of the plaintiff was that the agency had misapplied the rule of law because it didn't seem like there was any disagreement that the federal regulations require the sudden onset of an emergency symptoms in order to qualify for the program. Your Honors have pointed out in an order that you wanted to pursue that question. And going back over it and looking at the order and spending some time thinking about the legislative history here, I think the order the Court has caught is accurate. We've gone through and we've checked all the regs. It looks like the sudden onset requirement is not in the Medicaid statute, of course, but it is in the CFR. And it has been in the CFR since 1990. And the sudden onset requirement has been adopted in federal case law, a case cited in my brief on page 11, the Greenery Decision, which talks about what a sudden, I'm sorry, what an emergency medical condition is. That case of federal court of the Second Circuit found that it was clear and ambiguous and that it required a temporal component, a suddenness and unexpectedness. That language has worked its way into the state case, the state law, certainly. We don't have any cases, and it looks like Mr. Brevner has done a fine job collecting all the ones he can find. We don't have any cases that go back in time. The cases all seem to go forward in time. The question that we see over and over in the cases that are cited is a person comes to the hospital, they have an emergency medical condition, the hospital treats, at what point does it stop being an emergency medical condition? That's a very hard question. Let me ask you, do you have any case law that addresses the specific question of whether or not the sudden onset requirement in the regulations impermissibly modifies the Medicaid statute? Any cases that have directly addressed that issue, that argument? Yes, Your Honor, I've seen one of those cases. It's a case from Arizona. It's from 1997, before the Greenery Decision I cited. Where does that hold? It finds that the sudden onset requirement is not permissible. It's interpreting a state statute. Apparently, Arizona does it a little differently. And they're interpreting the emergency medical condition in a state statute, and they find that the sudden onset requirement is not something that was intended. However, that case is interpreting a state statute, and, Your Honors, I'll certainly provide that. And it was discovered, by the way, in preparation for all arguments. That's why it's not in the brief. But it precedes the Greenery Decision, which I think addressed the specific question that's issued here, which is what does the Medicaid statute mean when it says it? And because it comes before then, the agency, I think, reasonably follows the federal law as it was articulated in Greenery. It's important to point out that this was over 20 years ago, or at least 20 years ago. So when the court draws an inference as to what Congress intends, I would argue a more reasonable inference is that Congress realizes that the CFR includes a sudden onset requirement. There's a federal case, and a federal appeals court case, not one that was decided at the trial level, but had worked its way up through the system. Mayor, just a second. I want to just really get narrowly started. My colleague asked, Mike, that question that you're just talking about on that case. It didn't address this issue of when it came to the conclusion of the sudden onset. No, it was addressing a state statute. No, I'm talking about the federal case. It didn't address the issue that we've raised here about whether – you were just asked. I think it does, actually. It doesn't address the issue of whether the regs impermissibly – No, it does not address that. All right. Well, that's not – I mean, I'm not saying – but that was the question my colleague asked. And then the Arizona case, is that the Scottsdale health care versus different Arizona cases? No, Your Honor. Yeah, it's a case of Scottsdale. Do you have that cite? I'm sorry? Do you have that cite? I have it in my bag. I can probably provide it to the court. I'll provide it to the court. Just give it to the clerk later today. Okay. As I said, I think we can distinguish the case completely, especially considering the – the question is, what does Congress intend here? Right. Whether sudden onset is a permissible interpretation of the congressional statute. When Congress has reenacted the Medicaid statute several times now, the interpretation in the CFR was there. The court – the Congress could have changed the statute to make clear that sudden onset is an impermissible requirement, and it didn't. So the inference the State draws is, I think, the more reasonable one, is that in 20 years of this being an issue, it's not an improper interpretation to assume that Congress was okay with the federal regulator's determination that sudden onset was appropriate. Now, my opponent raised EMTALA in his reply brief, and that brings up the question, well, EMTALA also uses the term emergency medical condition. EMTALA doesn't have a sudden onset requirement. In fact, a sudden onset requirement in the EMTALA context would greatly undermine the way that statute works, because we don't want people in the emergency room caring for patients asking, well, how did you get this way? How long have you been this way before they provide treatment? EMTALA is all about getting people treatment right away. The Medicaid statute is about how it should be paid for or if it should be paid for with federal and state money. And as I've said, over the last 20 years, we've interpreted the statute as to have a sudden onset requirement. I urge the Court to follow that well-established law that's been the way for dormant for 20 years and to find that there's a sudden onset requirement. The question then becomes if your honors will go that far, and maybe I'll take a break here and address the question that you posed, Justice Hudson, which is what happens here if the Court decides that the rule of law is wrong? I'm most comfortable with a remand, Your Honor. I've not conceded anything in my brief. I almost never do. So I would remember if I did. I will if I get pinned, but I don't think we're at that place. The agency did not make a decision that this was an emergency medical condition but for a sudden onset. The agency said you don't have sudden onset, therefore it can't be an emergency medical condition. That's a subtle distinction but an important one. A remand would get the Attorney General out of the picture, and I would be most comfortable with that because that would put the people who do this all the time in charge of making the decision that they are statutorily charged with the maid meeting. And that way there's no question about what the Attorney General conceded. Just to pin that down, the Department ruled that the dispositive issue was a sudden onset requirement. Yes. They never specifically dealt with the other emergency medical conditions. So basically if we decide, in other words, that the sudden onset requirement impermissibly modified the Medicare statute, there's no finding effect then for us to determine that their decision was correct. It would have to be remanded in their opinion. And I think my opponent says that in his reply brief at one point, asking for a remand. And I read that and thought, yeah, that's right. If the rule of law is wrong, as the agency applied it, we ask the court, tell us what the right rule of law is, and remand it to the agency to apply that rule. And hopefully if that ever happens, it shouldn't take us forever to get it fixed. But I would urge the court not to change the rule of law, to keep sudden onset as it is, as part of the federal regulations, part of the state regulations, part of the policy manual, and then get to the question about whether, in fact, Ms. Arellano had a sudden onset, a sudden unexpected emergency, such that it was a clear error for the agency to deny her benefits. And I would suggest that the facts here are mixed. We have a lot of facts that go one way. We have facts that go the other way. And when you have that sort of situation, the agency should get deference, as Your Honor said when it began. She had suffered with ‑‑ she presented and she said she was having trouble breathing. That's how she presented to the doctors. She had been having trouble breathing at least three weeks. And at the agency hearing, she testified that it had been three months. So when the agency says we're not so sure that this is an emergent condition, it looks like you've been living with it for a long time, that doesn't mean she isn't entitled to treatment, by the way, at the hospital, because under the EMTALA statute, there is no sudden onset requirement. She gets treated. The question is, is whether the state has to pay for it. And, you know, the fairness or unfairness of that, I don't want to have to get into that argument because I just think it's a mess. But with regard to just whether the rules are being followed properly here, we've got a woman who I think can reasonably be said to have had these symptoms for a long time. She saw a doctor before she went to the emergency room, I believe three or four days before. That doctor didn't believe that he could have treated her, but the nurses who reviewed the records here had come to the conclusion that she should have probably been treated then, that this was a condition that existed before. So the agency, I think, made a reasonable call on the sudden onset question that the court should affirm. The more interesting question is the first one, obviously. If the court changes the sudden onset requirement, I think that you really have to be upturning the apple cart. We've got a lot of law in this area now with regulations and memos and policy and all this other stuff talking about sudden onset. If it goes away, the program becomes a much bigger program. And I think it might become a much bigger program not only in Illinois but in other states too because the federal regulation that we're talking about is not promulgated just in Illinois. It covers all the states. So it's an odd thing to think that Congress would reenact the Medicaid statute as it has over the years, have this sudden onset requirement from the Second Circuit Federal Appeals Court, and not move to correct it. It's not been a secret. It's not like people didn't know it was there. So were to infer then because Congress would have been aware of the regulations and would have been aware of that federal opinion that since then they have amended the statute and chose to leave it as it is, allowing the regulations to be an accurate interpretation of their intent. Exactly, Your Honor. Beyond that, even, I believe the Medicaid statute has been amended in the alien care arena. I know that hospitals have complained bitterly about the financial burdens of caring for undocumented aliens. And Congress, I'm told, has enacted legislation, I believe it was in 2000, actually providing for some relief for the hospitals that have this problem. So Congress knows that there are undocumented aliens being treated in emergency rooms, and that's a question that they've focused on, and they did not change the federal regulations which talked about sudden onset. So if we're going to draw an inference, I think the fairer inference is that Congress is okay with the federal regulations as they've existed for 20 years. With sudden onset to govern who pays for it, but a separate set of standards without sudden onset for who gets treatment. I'm sorry, Your Honor, I can't hear you. Okay. Let me see if I can rephrase that. So you're drawing a distinction between sudden onset should remain in the regulations, should remain at the rule of law for purposes of determining who pays for the treatment that was rendered. But you're suggesting that sudden onset has no place and has never had a place in determining who gets treatment if they walk into an emergency room. That's exactly right. The Emergency Medical and Active Labor Acts that Congress passed in 1986 requires hospitals not to dump patients who present with serious injuries or illnesses, and we've never, the federal government has never required sudden onset for that statute to be applied. Hospitals recently say, how unfair is that? The Congress has put on the hospitals an obligation to treat patients, but there's no way to get paid. And as I stand here, I just can say that's right. Well, the issue in this case, though, is post-emergency room, right? Yes. She was admitted at the emergency, yes, but, yes. Yeah. So, I mean, the question that my colleague asked is not the issue of fate. I mean, as the timing of this case really goes to who pays and who pays may affect who gets treatment after they're done with the emergency room. That's the posture we're at in this case, right? Well, no, well, yes, no, Your Honor, because the question is one of those. You have to settle on one or the other. Emergency medical condition is the requirement for Ms. Arellano to get any coverage here. So, I don't know that her transfer. I'm sorry, any coverage or any treatment? Excuse me. We're talking about payment, benefit. When, you know, her, and with regard to the Entala statute, the question becomes on when she becomes stabilized. A whole different question, and that's the Sustic case, which I've cited, and that's the question that they're struggling with at that point is, you know, when does the hospital's obligations to treat her end, and the hospital is arguing it ends when she's stable, and the judge in that case said, no, she's still got an emergency medical condition, even though she's stable, and it gets to be a mess. It's not this case. But in this case, I mean, as you point out, she went to the emergency room, and there's no dispute over who's going to pay for that. There's no dispute as to whether the hospital must treat her. Payment, yes, there's a big dispute. But the payment dispute isn't turning on a sudden onset issue because that doesn't exist at the emergency room door, right? For questions of treatment. Right. But what's the issue in this case? Is it payment for the emergency room services or payment for subsequent services? Well, I don't believe Illinois is one of the states that limits things to emergency rooms. So in her emergency medical condition, I believe, and Mr. Brevner may correct me, but her emergency medical condition can continue past the emergency department, which is the term of art under ANTALVA. Okay. And I think Mr. Brevner's position, and forgive me if I've misstated it, he'll correct me no doubt, is that her emergency medical condition may have lasted past her time in the emergency department. He's not seeking reimbursement for her chronic problems, but he's sort of holding her pneumonia as her emergency medical condition and saying things related to her pneumonia are covered. This is one of the questions which may end up having to be considered on remand if the court changes the rule of law. Not that I'm recommending that. No, you're not conceding anything. I am. Thank you, Your Honor. Let me answer this for the question. The federal case that you alluded to this morning, again, that did not specifically address the argument of whether the sudden onset requirement impermissibly modified the Medicaid statute. That specific issue was not addressed in that case. That's correct. But it does address the question as to what an emergency medical condition is and then describes what an emergency medical condition is completely consistent with the federal regulations and with the state regulations in this case. So sudden onset is very much an issue in greenery, and I would argue that that supports the court's... And you'd have a much stronger argument, though, if the Second Circuit had considered this expressly and then Congress did or did not do, you know, corrective action. I mean... Much stronger. I wouldn't want to quibble, Your Honor, but I think it would be stronger, but not much stronger. The question is not one that would be overlooked by the people who are active in poverty law and thinking about these questions. Well, that's the question. That's what that question was going to. Is it possible that it just wasn't expressly addressed and your position is highly unlikely it would have been overlooked even though it wasn't mentioned in that case. All right. Anything else? Okay, Your Honor. We'd ask that the agency's decision be affirmed. Thank you. All right. Thank you, counsel. And rebuttal? It's the court. Just quickly, I guess the confusion here in some respects are that no other state is using this mechanism to deny alien emergency coverage. In other words, if you look at all the cases that we cited, you're kind of wondering, well, why hasn't this issue come up in other jurisdictions? It hasn't because no state is doing what Illinois is doing. And what Illinois is doing is they're using this like, I guess to make an analogy, like a subprime auto insurance carrier where, you know, you bring in the money. So we're creating this health care reform in subprime mortgages? Sure. If you look at the hearing down below, I guess, Judge, look at the hearing on this. I mean, it's not as if they conduct a full-blown hearing. It's even worse than, say, an unemployment hearing. I mean, they're held in the local offices. I mean, usually a hearing officer appearing by telephone who's not an attorney or any kind of trained hearing officer. It's a promoted social worker. And they're not – you know, there's no opportunity really to gather evidence. The CAU, which makes this determination, we don't even know who they are. I mean, it's – and they certainly, if they wanted to have informed medical advice on when there was an onset, they could have added that to their certification requirements, which they require a treating physician to certify the condition that this is an emergency treatment. You see that in this case. They certainly could ask the treating physician if this was a sudden-onset situation. They don't. Instead, the record after the fact is sent down to somebody in CAU – we don't know who they are – who makes a determination. You see a series of single-paragraph determinations where they summarize the medical records. And they say, oh, there's no sudden onset. She had symptoms for three weeks or two weeks or whatever. So what is the standard? I mean, it's not informed medical decisions that are making these standards on when it's in a sudden-onset situation. It's going to qualify. What you have is essentially the department looking at this retrospective, after the fact, and using it to deny really what are claims that clearly fit under the federal law. Again, if you look at her case, it clearly fits on a four-score of the federal law, and the state is using this sudden-onset not to expand coverage, which is what the regulations suggested when they were adapted, but really to deny payment for services that, unfortunately, hospitals and physicians and other medical providers are having to provide. So it is a payment statute, but are the hospitals continuing to have to treat these people? And we said there's probably a million undocumented immigrants in this state. They're coming into emergency rooms every day, every hour. And are the hospitals and physicians supposed to treat these people without any source of reimbursement? They're not supposed to be fighting illegal immigration. They can't control it. And that's what we're facing. We're facing this being a tremendous burden on our health care system in this state. And the state is taking the position that if we can deny these claims, we're fighting undocumented immigrants, so we're letting the hospitals and the doctors bear that burden. That's what this case is about. That's going on now all over the state. You walk in any emergency room, and there will be undocumented immigrants sitting there waiting for treatment. And when Mr. Alex is proposing the state, hospitals should just treat them and bear the burden. No reimbursement. And obviously they're saying, he's suggesting there's $312 a patient has to pay. Well, what is the likelihood that the hospital is going to recover payment from an undocumented immigrant from Mexico or wherever? That's the issue we're facing here. Let me ask you a question. What part of the treatment is at issue here for payment? I mean, that was a colleague, Justice Georgeson, asked the question, and then I was trying to clarify what the answer was from the attorney general there. I mean, they go into the ER room, there's no question they get treated, and is there a payment dispute on that point now, too? No, they're not applying to sudden onset in the ER door, right? Yes. They're saying there is no payment whatsoever for this condition. And what they're saying is because symptoms lasted, oh, two weeks or three weeks before the person presented in the emergency room, if there's no sudden onset, we're denying the claim entirely, which means that absent a car accident or some type of immediate injury or a crime or whatever, absent those situations which are unusual, any usual situation you have, which is this is a usual situation, someone has an underlying health condition, they get pneumonia, they're drunk, they come in, they can't breathe, they're coming in the emergency room, and she's admitted to the hospital and treated for 18 days. Now, what happens is once that occurs, the alien emergency continues on during the entire period, from the emergency room treatment all the way through to the person's discharge from acute care. It wouldn't pay for aftercare, but it would pay for the period of time that she was in the emergency room and then she was obviously transferred immediately up into acute care inpatient, and she was there for 18 days. So basically it would cover that entire period of time, and they're denying that claim on the basis that, oh, she had symptoms, and therefore we're denying it as not a sudden onset. Well, how would we distinguish then between that and a chronic condition which is not covered? Well, a chronic condition would show up under the medical records. And again, we have an individual here who's a healthy 37-year-old individual with no prior history of any medical problems. Do you mean the history of physical or medical records? Well, the report, of course, the report when she came in the hospital. There was a request, of course, they're asked to give their history, and she reported no health issues whatsoever. And there was nothing from the diagnosis that determined she had any prior health issues whatsoever. So she was healthy, mother of five children, 37 years old, working, minimum wage or less. So she was poor, obviously, but she was working, was healthy, reported no prior health conditions other than this request that she was seriously ill, was hospitalized for 18 days. And this is to cover the entire stay where she was in acute care. And if you look at the cases from the other jurisdictions, that's what they're also talking about. It covers the acute care. It doesn't cover the subsequent, like, dialysis or chemotherapy or skilled nursing care for traumatically brain-injured individuals. Those are the cases we cited from other jurisdictions, but they're all covering that emergency room admission and acute care in acute care setting, and there's reimbursement under the Alien and Federalist Law for that provision, yes. Doesn't that just mean acute care means she's in the hospital? Yes, she's in acute care. That's the definition of acute care, you remain hospitalized. Basically, yes. Although you can be hospitalized under observation. You can be in the hospital in some type of psychiatric facility for observation. So those would not be acute care settings. Yes. The vast majority and the cases that talk about when you're stabilized versus not, acute care is determined to be while you remain hospitalized. Yes, that's correct. Yes, that's correct. In those cases, again, there could be observation. You could be admitted for observation purposes. And, you know, in terms of the reimbursement for just someone who walks into the emergency room and is discharged, doesn't get admitted, the state reimbursement for that is $75. Okay, but I wanted to get across. The Attorney General before made the point saying that there is no sudden onset requirement. I thought under whatever statute or regulation applies to the guy who shows up, the person who shows up at the ER door. Now, you're agreeing with that by saying the payment is limited to $75, is that right? Yes, if they're treated at an emergency room visit, the emergency room visit gets put to state. I mean, the bill is out of state. So under this particular, your patient here, the patient at issue here, this woman here, the hospital should be able to collect the $75 for the ER visit, no? No, no, it's all been denied. The entire claim has been denied. And I guess that's what I'm confused about. Because if there's no sudden, I mean, if she had gone in the hospital and was discharged from the ER, then they would have been able to collect the $75? Still would have been denied. They're denying it. Well, that's what I'm confused about. I thought there was no sudden onset requirement at the ER door. Well, in terms of at the ER door, what happens, of course, as you know, under TALA there has to be a medical screening that takes place. And you know, you walk from your own experience. You walk in there and find out if you just got a cough and need to aspirin. The nurse sends you away. If they determine that you need to see a physician, then you see an emergency room physician who then has to perform the requirements under TALA of giving you an adequate medical screening to see what your situation is and that you're stabilized before you can transfer or discharge. I'm just getting at, what is this distinction between, he was trying to point out a distinction between where there is no, at no level of regulations have they attempted to impose a sudden onset requirement. And I thought he was saying that was at the emergency room. You're saying what? I'm saying no. Not as a practical matter, but that's what the law says. Well, the law says, and it defines emergency medical condition, doesn't limit where the treatment could take place. It doesn't say it has to take place. That obviously is the setting from all reality that you're correct, that that is really the setting generally. When people are walking in or being, going to the emergency department, that's what's taking place. No statutory requirement says where the treatment has to take place, but for practical purposes it takes place in the emergency department, that's correct, at the hospital. If that's your question. Or an emergency clinic. Okay. Anybody else? Okay. Well, thank you both for your arguments. May I just give you the $1,500? The decision is yours. Thank you. Thank you.